Good morning. My name is Jack Gordon. I have the honor of delivering the oral arguments on behalf of the appellant, Steven Holland. I need to apologize to this panel. I may be grinning throughout the course of this presentation. That is not a disrespectful smirk. Rather, I'm filled with a very nostalgic enthusiasm. The first argument that I ever made to a very real judge in a very real courthouse was in this very place more than 30 years ago when I was a law school student here in New Orleans. That was the first and last time I've ever presented or appeared before any judge in the state of Louisiana. So again, I mean no disrespect but I am very, very pleased to be here. The second apology I need to make is that I am not an appellate lawyer. I have no occasion to provide oral argument even at a state appellate level, let alone a federal level, this altitude. And that's because my colleagues who practice at the appellate bar, who practice appellate law, say, Jack, gunslingers don't stick around for the embalming. But I'm nevertheless here providing our argument because I wasn't given the opportunity to participate in that gunfight up in Gulfport, Mississippi last year. And of course, that's one of our points of contention on appeal. You know, an individual's right to select the lawyer of his choice is a fundamental right. It's found in due process, Fifth Amendment, Fourteenth Amendment, and I would respectfully suggest the Seventh Amendment as well, right to a civil jury trial. It means more than simply having a day in court. It means having your day in court. Mr. Gordon, let me ask you, since that is one of the issues here, and I was planning to ask you, you're raising it front and center, what is it, with all due respect to the attorneys who did try the case, what is it that you believe your involvement would have made a difference in terms of what happened in the case? And I have to answer that question in sub-parts, judge. Part number one, we have to judge effectiveness based upon results. We're the appellate. We didn't get the result we wanted. And I think to some extent that's because the burden of a lawyer is more than merely persuading the judge. And I would respectfully suggest, and we're going to touch on this in a moment, but based upon his honor, Judge Girola's rulings, he wasn't properly educated as to what this case was all about and how the law should properly be applied to the facts of this case. But with respect to effectiveness of counsel, that's really not an issue for purposes of this Court's consideration. Even if Atticus Finch and Perry Mason were trying that case, that doesn't mean that appellant, because he wanted me, that doesn't mean he doesn't have the opportunity to let me present his case. And again, that's what really, that's what it means by having your day in court. Well, you know, we are a pesky appellate court, and so we're going to ask you for precedent for that proposition. Does it, do you have to show prejudice, or is this some sort of structural error that you don't have to show prejudice for? Judge Elrod, Judge Elrod, you have to show some cause and effect, meaning if there's an error, because again, you don't want to otherwise deal with that tipsy coachman result, the Court's error has to result in adverse consequences to the party who's appealing. Again, effectiveness is judged by results. I would respectfully suggest that had I tried that case, the Court wouldn't have entered a ruling granting the Rule 50 or a Tennis Motion, nor would the Court have otherwise improperly denied the jury from considering punitive damages, even if it had granted the ORA Tennis Motion on civil conspiracy, because intentional breach of contract carries with it the opportunity. How are we supposed to judge that? I mean, are we supposed to judge that based upon whether you're eloquent here today, or are we, what would tell us whether or not you would have made a difference? It's an awkward thing to ask you about yourself. I would suggest that the Dresser case probably addresses it the very best, the 1992 case here from the Fifth Circuit. It is a fundamental right, and again, for purposes of appeal, if an error was made, there has to be some consideration as to what the result otherwise could have been. We'll never know. I mean, it's impossible to point to. I guess my difficulty with it, and you kind of cut to the chase right there, without any particularized prejudice or injury or specific identification, it would sound as though a litigant could ask for a do-over, that had I had different counsel, and hopefully better counsel, or maybe a counsel that had the benefit of hindsight of seeing the first counsel try the case, now I'm here, Court of Appeal, please give me a do-over. And I don't think that's what you're asking for, but I'm still trying to understand what it is you're identifying that would cause us to entertain that. Again, to some extent, I would suggest that it's a fundamental error. So given the fact that it's, that the appellant was eligible, he has a constitutional right to select counsel of his choice. Whether or not counsel is effective at the level below really isn't an issue. Well, but the district judge does have, does he not, plenary authority, for instance, to make rules that I think are fairly routine in most district courts about counsel must attend pretrial conference, trial counsel, and so on and so forth. There are certain rules that the district judge, assuming they're reasonable, can employ and also preclude attorneys from trying the case if they don't comply. Absolutely true. He has the discretion. The question is whether he abused that discretion. And there you have to look at the specific facts. The scheduled conference that I didn't attend wasn't a pretrial conference for purposes of the court's rulings, motions to eliminate things of that nature. The very purpose of the rule is to streamline the administration of the trial, meaning if the lawyer isn't there and the court makes certain rulings or talks about judicial preferences, lawyers don't hear it, they may again potentially cause a mistrial or otherwise run afoul of those rulings. Tell us again, what was the reason that you were given by the court when you attempted to enroll or participate in the trial? Because I hadn't otherwise complied with the court order of attending all scheduled conferences. Interestingly enough, that local rule in Mississippi, Judge Engelhardt, doesn't specifically indicate you can't participate in a trial. It says if there is a willful and deliberate violation of a court order and failure to attend a scheduled conference, then the court may conduct an appropriate. But here you're talking about the dresser case specifically indicating a local rule cannot provide a basis for otherwise compromising a fundamental right. It's not compelling enough. Were you permitted to sit in the courtroom and whisper in the ear of the counsel? Wouldn't let me. His Honor, Judge Garrola, at the time he made his ruling, and he had already granted my motion for Pro Hac Vitae admission. So I'm qualified, I'm licensed to try this case in Mississippi. So you couldn't sit even if you kept your mouth shut? Wouldn't permit me, Mr. Gordon. That would eviscerate the nature of the rule if I were to permit you to sit at the table and pass notes to your colleagues. Could you be in the gallery? I could have been in the gallery. But you weren't allowed to interact during the, okay. Could I get a word in edgewise here? Yes, Judge. This case isn't about you. True. Okay, so why don't you talk about what it is about, okay? Yes, Your Honor. I mean, you've used up all but seven minutes of your argument, and the case has actually got a subject matter that's pretty hard. So why don't you talk about that? Thank you, Your Honor. And we can, I suppose, combine some of the specific issues and points on appeal. But the very nature of this case goes to the failure of the health care providers, in this case, Steve Holland, to otherwise get the benefit of their bargain. Judge Joe Flatt talks about it in the HCA case, and he does probably the best job. The whole nature of a PPO, and again, I think this is why, in all fairness, Judge Girola Need to stay somewhat close. Judge Girola, I don't think, had a clear understanding because when he made his ruling, he says, guys, you haven't otherwise demonstrated that a PPO organization is inherently unlawful. And that wasn't our assertion. That wasn't the nature of the case. A PPO is a good thing because it provides patients greater access to more doctors. It provides better care. It provides the health care providers, doctors, therapists, specialists, the opportunity to see more patients at a lesser cost. So managed care is a good thing. It's this circumstance where there are duplicitous side schemes, under-the-table transactions. The nature of the agreement here was Multiplan is supposed to essentially allow Steve Holland to be part of the network, and then contract with Payors, insurance carriers who are going to send patients his way, steerage direction-wise. Mississippi law requires a physician referral of an exercise person, as I call them, having a profound allergy to exercise. An exercise person requires a physician referral. All the rest of the people who are getting referred. A very different animal, Your Honor. The other difference is there is no financial incentive ever under Mississippi Workman's Compensation for purposes of the patient, ever. There's no copayment. There's no deductible. So there can be no financial incentive created to steer patients. In the state of Mississippi, under the Workman's Compensation schedule, you can't just select a physical therapist. You can't just select any doctor. You have to go see your primary and then ask him for a referral. It doesn't matter who the referral is, whether it's also someone who's on your health insurance plan, whether it's someone you've never seen before, whether it's someone you're familiar with. The schedule pays the same amount for services and treatment to all doctors, which is why, again, it doesn't make any sense for these brokers, these middlemen, these repricing organizations to otherwise enter into agreements with Payors in the work comp circumstance because there can be no steerage. And that's what In order for the provider to otherwise be required to perform his services at a discount, he has to get some consideration back. And the consideration is the potential to see more patients. In this case, Mr. Holland was not listed on any of the directories. MultiPlan entered into agreements with Coventry and Procura. Procura doesn't even have directories because they are, again, another type of broker. Coventry has a directory of health care providers. Mr. Holland wasn't on it. Coventry then sells further access downstream to other brokers and repricers who, in turn, sell them even further downstream. Whatever discounts the payers wind up enjoying getting access to, that's money that's siphoned directly from the health care providers. And now it's whacked up. It's split up. That's why Judge Jofeld said, listen, this is terrible. This is a circumstance where all of these brokers and transactions that the providers know nothing about. So his complaint is that the discount was applied when he, A, wasn't aware of it and B, had not agreed to it except with the PHCS. Is that correct? But he did receive a letter from MultiPlan saying, look, we're now involved. We have taken over PHCS. He's claiming that he did not consent. Now, what contractual provision, assuming that's correct, you're nodding your head. Assuming that's correct, what provision of the contract, or maybe lack of a provision, are you arguing creates an opportunity for him to recover? I think, respectfully, Judge Engelhardt, that's almost a distinction of a difference. I think what you're referencing is the difference between a modification and amendment to that reference suggests that you can modify by virtue of notice to the health care providers. But to the extent that this constitutes an amendment, it would be an impermissive amendment because the PHCS contract specifically says that all amendments have to be agreed to bilaterally, in writing, expressly. That wasn't done. But I'm going to respectfully suggest it's kind of a distinction without a difference. Here's why. And I appreciate the reference to that 2007 letter. Among the things that MultiPlan told this health care provider and everybody else was, we're going to sell to other people, other payors. And the PHCS agreement says it's payors. We're entering into agreements with payors, not other brokers, not other network access aggregators who are all taking a piece of the action. You are going to be presented on online and downloadable directories. You're going to have direct links from all of our clients' websites. You're going to have assistance with client-sponsored education. No, you didn't. You didn't get any of that at all. Rather, you sold access to the discount, and Steve Holland didn't get anything in return for that, certainly not any steerage and certainly not under workman's compensation, but under anything else. There's no system in place. They keep making these unilateral assertions that this will be good for you because you'll have access to more patients. How? There was not one shred of evidence at trial to refute the testimony of Steve Holland that he didn't receive any steerage and that he didn't even have the potential opportunity to receive steerage because there wasn't any mechanism in place. Counsel, can we talk for a moment about remedy? What is it that you seek? Well, we certainly seek the opportunity to have the verdict where the jury made the determination after hearing all of the evidence that the contract was breached and the amount of monies that were taken from Mr. Holland should be properly reimbursed to him. Could we vacate the Rule 50B in Brinder and then we'd be done? You could provide partial justice like that, Judge Elrod, but the problem is that Judge Girola further erred by not allowing us to proceed with our civil conspiracy claim when we demonstrated that there were two or more agreements, these downstream side deals, if you will, of misrepresentation and intentional breach of contract. There was overt act by virtue of the fact that Mr. Holland's bills were unilaterally discounted, and then he received damages. So we'd like to be able to bring the claims under civil conspiracy and intentional breach of contract for purposes of punitive damage as well. So you'd like what? We'd like the case to be reversed and remanded for further proceedings. Let us retry the case and let the questions of civil conspiracy, punitive damages, all of the indications that we've made in our brief go to the jury for purposes of proper consideration. Thank you. You still have time. Thank you for your patience, Judges. Can I please the Court? I was interested with counsel's, frankly, use of pejorative terms that don't apply here. This is a contract case. It's not fraud. It's not intentional misrepresentation. There was no deceit and deception. That's just not in the record of this case. What's in the record of this case is there was a contract, and that contract was modified through procedures that were provided for in the original contract, Section 3.7, that allows upon notice, effective upon mailing, that the terms of the contract could be expanded to include new programs, new payors, new relationships, and the benefit that Mr. Holland would receive from that expansion is access to the various people who are covered by those payors. That's exactly what happened in this case. It boils down to a contract that was modified through, not because of any issue with respect to an amendment, because in fact, Judge Girola found that through a summary judgment ruling, which was not appealed and was not before this Court, that the notice was an effective modification of the contract. And that notice happened twice. It happened in 2007 and it happened again in 2011. The 2007 one is important because that brought multi-plan into the relationship, although not workers' comp at that point. And in 2011, workers' comp came into the picture. And if you look at the notices, which the 2007 notice, the 2011 notice in particular, it is highly detailed in terms of providing to Mr. Holland exactly the information he needs to know what's happening when a workers' comp claim comes to him that has a relationship to the multi-plan network. In the letter in 2011, it says specifically, here's the discount that's going to be applied. And that's the only discount that is applied to him. Is there anything in the contract counsel just suggested that there would need to be a bilateral agreement? Is there anything under the provisions that the letters were sent under that requires some type of written acknowledgment or, I mean, obviously if he gets the letter in, I think you said 2007, and then the second letter, and he doesn't object, there's an estoppel argument. But does it need to be in writing? The contract specifically, 3.7 is the provision in the original contract, the 2006 contract. It does not provide for any acknowledgment. He has the right to terminate if he concludes that he doesn't want to proceed with the deal. And he has the right to terminate not only the entire relationship, he has the right to terminate the specific new program that was added, new relationship that was added. So he has that right. And as I said, in the contract itself, although there is a provision for written amendment of the contract, that, which was referred to by Mr. Gordon, that's Section 9.2. That's not what these notices were sent out for. And that's Section 3.7 is what the notices went out under, which Judge Girola, again, on summary judgment, found to be effective modification of the contracts. And that summary judgment ruling was not appealed. In fact, during the trial, reference was made to it several times. The issue of whether or not there was a factual issue raised about whether Mr. Holland actually received the 2011 notice, it's irrelevant. Mailbox rule. And counsel conceded that at trial. So from that standpoint, everything that Mr. Holland would be entitled to in terms of a contractual relationship, he got. Now, what, in terms of what the trial court looked at ultimately was the steerage issue. Everything. I'm sorry? How did he get everything? I guess you're going to talk about steerage. That's how. They couldn't even do steerage, the workers' comp. Because steerage is not limited to financial incentives, which is what, that's exactly what is trying to be set forth here. That's not what's in the agreements, because the agreements don't specifically say financial incentives only. And that's something that applies in the health benefit field, not in the workers' comp field. We've conceded that there's no financial incentive. But there is definitely steerage that's provided in the workers' comp setting. And that was made very clear by the evidence we presented and the testimony of Mr. Wampler, the expert that the judge relied on in entering the judgment for, as a matter of law. So there is steerage. And he talked about the referral patterns, that people who were benefit would be providing health benefit services, they would refer to workers' comp, and then they would do the same and vice versa. That's steerage right there. Also, it's clear from the handbook that is part of the relationship that there was an in-network referral obligation, a best efforts in-network referral obligation for all the providers. And that was testified to at the trial by Dr. Hull, who was an uncontradicted witness, who said, yes, there's a, yeah, I'm part of this group. And if you're part of the group and the handbook is put into the relationship by way of the 2006 contract, you have an obligation to use your best efforts to refer in-network, which means to Mr. Holland. So those are some of the examples of steerage that were made available. The other thing is, it's clear that Mr. Holland would get information when the patients arrived, the testimony of Mr. Williams and the testimony of Mr. Foster, who were patients who testified at trial, said, you know, I hurt myself on the job, so my employer sent me to a physician who referred me to Mr. Holland. And when I went to Mr. Holland, I had paperwork in my hand that said, here's who the carrier is. And one of the witnesses, I think it was Mr. Williams, testified that he had a case manager from the payor who was involved in various steps of his treatment. All of that is the benefit of the bargain that now Mr. Holland was claiming he didn't get. He had all the information. He got paid. He knew where to send the bills. And the bills were paid. Yes, a discount was applied. But he also got access to those patients and other patients because of the relationship that was expanded through the contracts. There's no issue here that the contracts with Coventry and with Procura provided that those companies, clients, users, there are various terms that are used in the documents, those payors were obligated to pay Mr. Holland. And they did. And they did. That's why the issue of, you know, it all boiled down to whether or not there was steerage. That's what the summary judgment ruling suggested. When he denied our motion for summary judgment, said I want to take this to trial. When he, again, looked at the issue as we got to the end of the presentation of evidence, if you look at the jury instructions, the jury instructions talk about that. That's what the issue is. It's not all these other side issues. Did he get steerage? And the answer is yes. And the evidence shows it clearly. The fact that the jury didn't accept it, Judge Girola had to step in and appropriately make a determination. Why? Why did Judge Girola have to step in if the major issue in the case is steerage and it's murky one way or the other, whether your version of steerage and you put on something and then they put on other things? How is it as a matter of law that there is steerage such that the jury verdict had to be overturned? Well, because, Your Honor, they didn't put on evidence to indicate, other than they didn't get financial incentives. It is clear from the testimony, it's clear from the documents, from the contract, that steerage is not limited to financial incentives. And it's not limited to having an ID card. That's not part of the steerage that's part of the contract that came in through 2007 and through 2011, when multi-plan came into the relationship and then when workers' comp was put into the relationship. Well, there's certainly some evidence in the record, at least from the testimony of Holland, that people weren't directed and steered as they were supposed to be. There's some evidence in the record to support the jury's verdict. Well, but the standard is, as you know, it can't just be a scintilla of evidence. And in this case, it appeared to Judge Girola that it was beyond that, that the steerage was clearly presented. He, again, cited Mr. Holland's testimony, frankly, was undisputed, that, you know, here's how the real world works. You know, you're not in a position, I understand, at this stage to be able to judge the credibility of witnesses. But it's important to understand that the witnesses that the jury heard, there were witnesses who clearly understood the industry and then there was Mr. Holland. And I understand that's the province of the jury to weigh, and it's not for you. But in this particular instance, Mr. Wampler's testimony was uncontradicted with respect to referral patterns. Well, we're not supposed to weigh the evidence in that way, and the trial judge isn't either unless it has to be stricken because there's some kind of fraud or problem with it in such a fundamental way. So neither of us are supposed to be going through and deciding whether the expert is more believable than Dr. Holland. And that's why I began my statement in exactly that way, because I recognize that you don't make judgments as to credibility, but you have to look at the facts that are in the record and what was presented and what was not. And what the jury heard is clearly that there was steerage. I understand Mr. Holland says there wasn't, but it's clear that these were the facts. The discount was applied according to the terms of the contract that he agreed to. The issue appears to me to have been at some point he didn't like his deal. And I remember there was testimony during the trial, which you may have seen the transcript about, you know, a deal's a deal. At a certain point, Mr. Holland just made the determination because he had been doing workers' comp work that, you know, I'm not going to accept this. And that's not what the bargain that was entered into was. The bargain was, we will give you access to more and more patients through these relationships, and when those patients come to you, you have an obligation to give them a discount. And that's exactly what happened. So the jury, in looking at the evidence, came to a conclusion clearly, and this sort of goes, is relevant, I guess, also to the effectiveness of counsel, because, you know, the case was presented to a jury and a verdict was entered. It was a verdict that we think is wrong, but, you know, there was clearly enough evidence for Judge Girola to say that steerage was clearly established. And that was the case. That's not the standard. Clearly enough evidence to establish that steerage was established. It has to be that there's not evidence to support the jury's verdict. You're saying it the opposite way. Well, what I would say, Your Honor, is the standard is that no reasonable jury could find, as they did, based on the evidence. So that's the standard, and I think that Judge Girola recognized that that standard was met, and we think that this Court should follow in his footsteps and recognize that as well. I just want to touch on a couple of the other issues that were raised. The whole civil conspiracy issue is tied to whether or not there was, there has to be a tort. There has to be an underlying tort. It's clear under Mississippi law. There's no tort claim in this case. What's the best authority for that? We cited it in our brief. Based on a contract that you must have also in tort. It's not a contort sort of thing in Mississippi. It's not a contract tort. There is in Mississippi a cause of action for intentional breach of contract, but when there was an effort made to amend the complaint long after the amendment deadline had passed, Judge Girola determined that that amendment couldn't be made. So there was no, there was nothing before the jury other than a straight breach of contract claim. Do you have your authority? If you don't, I don't want to... It's in my brief, Your Honor. That's okay. Give me a second. We'll look at it later. Yeah, it's in there. So it's absolutely clear under Mississippi law that civil conspiracy can't be supported by a breach of contract? Except in the context of a tortious breach of contract, but that claim was specifically tried to be added and was not. The amendment to add that to the case was denied by Judge Girola because it happened a year after. Is intentional breach of contract the only type of tortious breach of contract? No, I mean... Couldn't there be some other kind that... Another breach of contract that would support this? There were no other torts alleged. I understand the argument today that there was fraud, there was deceit, but none of that took place. There was nothing that was intentional misrepresentation. There was no reckless disregard. Everything was followed to the letter in terms of the contracts between the parties. So I don't think that that's a viable claim. Your Honor, the citation for the conspiracy claim, but must be based on only tort. There's a Fifth Circuit decision, Aiken v. Rimkus, consulting grip. And then there's in Mississippi... No, I'm sorry. In Mississippi... Well, those are the cases. It's on page 33 of our brief. Punitive damages under Mississippi law is something that, again, requires a higher level of proof. We also have that in our brief in the J.C. Page. How did that claim get to be dismissed? Was that something that Judge Girola questioned? Yes. Or if it showed cause or something? The Mississippi statute provides that the court is the gatekeeper. The trial court is the gatekeeper. And so he has to make an initial decision of whether or not punitive damages would be justified, and then the case gets presented to the jury. And he specifically made a ruling that, under the Mississippi statute, that there was no evidence to support a punitive... But his ruling is triggered statutorily, not based upon any motion practice. Correct. That's right. Your Honor, just for your benefit, punitive damage discussion is on page 36 of our brief. 36 and 37. And 34, not 33, is where the Rimkus side is. Oh, I'm sorry. I apologize. I have a two-sided copy, so maybe the pages came out differently. I have it on 33, but you're right, Your Honor. I mean, that's the section of the brief that discusses it. You know, we've heard a lot from Mr. Gordon about the fraud and deceit and everything. It's just, it's not there. It's not there. And with respect to steerage, I want to return to something that Mr. Holland himself conceded at trial. It's an opportunity to see patients. It's not a guarantee that those patients will come to you. But if those patients come to you through this network arrangement, which, by the way, the Mississippi Workers' Comp Commission, in some evidence that we put into the case, plaintiff's 31 is the exhibit number, specifically said, you don't need a contractual line. The network arrangement is enough. Now, we have the contract language, which I cited to you earlier. If you look at our exhibits, P-24 and P-25, which are the contracts with Coventry and Pecura that MultiPlan had, those contracts provide P-24 at 5.9 and P-25 at Section 3A and Section 5. They provide specifically that the payer is obligated to pay. But his gripe is that he wasn't paid what his normal rate was, that there was a discount imposed against his will and against his contractual choice. Isn't that true? Well, that's his claim. But, Your Honor, it wasn't against his will because he agreed to it in the contract. He agreed to it in the contract. He agreed to it by, if he had an objection to what was otherwise an appropriate application of the contract language, he could have terminated it. He didn't. He didn't terminate in 2007. He didn't terminate in 2011, allegedly because he didn't receive the 2011 letter. But it doesn't matter. Any evidence that he did that you could cite us to? There's deposition testimony that he gave prior to, and it's in my cross-examination, Mr. Holland and I raised the fact that he had testified to that before. That he had received it. That he had received it. And at trial, the statement that he made was basically, well, I got another letter in 2011. That's the one I met. So that's how that issue got resolved. But it's definitely in the record of the case. Counsel, if just hypothetically, if we disagreed with the, we don't think the jury verdict should have been overturned, just hypothetically. But we agreed with you on civil conspiracy and punitive damages, would we render or would we still need to send it back? Well, the problem that we have with simply having it rendered is there's a prevailing party clause in the case. And so that has implications beyond the $14,000. And so I think at that point, you know, our approach would be, you know, if there's going to be a redo, you know, it needs to be focused on that issue. So we resolve that issue and we can deal with that second issue as well. I think of rendering a verdict of just the $14,000, you know, reinstating the jury verdict, which we think should not happen, obviously, is something that isn't really a good result for us, given other parts of the case that are involved. Thank you, Your Honors. I'm sorry. I know your time is up, and I'm sorry to my colleagues. But can you please address Coventry and Procura and whether they're payers in just a succinct manner? Sure. Coventry is a company that has, like MultiPlan, it has network. And it has relationships with other insurance companies. Coventry itself actually had an insurance arm, but it's not really as relevant. Procura does not. But under the language of the contracts, it fits in under the term program. So it's not necessarily payors. And I do want to address there's an issue that came up about payer acknowledgments. There's no payer acknowledgment contract for Coventry. Okay. That's why I was just — I knew where you were headed. That's why I was going to raise that. If you look at the definition of payer acknowledgment in the contract, the 2006 contract, it's simply a contract that obligates the payer to pay. That's what happens through the relationships with MultiPlan, Coventry, and Procura, because the sections I cited earlier to Judge Engelhardt provide exactly that. That is the payer acknowledgment. It's not a — the terminology in the contract, I can understand, seems to suggest that there's a separate document. But it's not. It's just a contractual obligation. And that acknowledgment is there. It tells the — the contract says what you have to include in the payer acknowledgment. So it is a document. But that's included in the Coventry Procura document, an obligation to pay. Okay. Let me turn to the provision you're looking at. The other side can have the additional two minutes, too. But I just — I'm sorry to take the time. No, that's okay. Agreements. PHCS — this is PHCS, but obviously this also applies to MultiPlan when it was brought into the process. PHCS agrees that it has entered into agreements with payers for the use of the PHCS provider network. Okay. That's the definition — that sentence is what a payer acknowledgment is. And that's definitely what the Coventry and Procura contracts do. It says an obligation to pay or arrange to pay for covered care to covered individuals in accordance with the articles — another article in the contract. That's what those contracts do. That's exactly what those contracts do. So, again, I understand — you know, I understand your puzzlement, but it's not a separate document. That's not the way it's defined in the agreement. And, again, you know, if you look at what transpired, Mr. Holland got all of the information about these relationships because he would get this information presented by the patients. There is a website that you can look at, and there's evidence in there that every provider has access to that says, here's who the payers are. It's not just whether he gets the information of who they are. It's whether or not they become actual payers that have obligations themselves and agree to commit to those obligations. And they did. And they did. Because they paid them. Okay. I think you've answered my question. Thank you, Counsel. Thank you, Your Honor. Thank you. May it please the Court. The only evidence in testimony at trial was that there was no steerage being provided by these seven payors. These seven payors did not have — there was no way for them to steer patients. Because, again, under Workman's Compensation, as Judge King indicated, only a primary care physician can refer those folks. But the other issue is, under Workman's Compensation, the employee selects who the primary care physician is. Or the employer can make a recommendation, but then the employee has to agree in writing to that physician. How is that physician going to get a patient to Steve Holland? There's certainly no financial incentives, as we've all discussed. He wasn't listed on any hotline. He wasn't listed in any directories. On the provider portal that was referenced by Multiplan, there's no indication that these seven payors are on the plan. So Mr. Holland was deprived of his right to say, oh, let me see, Coventry? I'm sorry. This particular security? Oh, they're on there? I'm sorry. Again, I don't want to accept you. Because Workman's Compensation under Mississippi guarantees a certain amount for each particular service. It's not a function of his standard fees. His standard fees happen to be aligned, Judge Englehart, with what the Mississippi Workman's Compensation laws are. With respect to the 9.2, the difference between amendment and modification, again, all ambiguities have to be resolved in favor of the party that didn't draft the contract. And if you take a look specifically at 9.2, it says, this is the 2006 contract, except as otherwise specified herein, this agreement may not be modified or amended except by mutual consent in writing and signed by participating professional, that would be Steve Holland, and PHCS. Coventry is not a payor. This is really important. Procura is not a payor. Mitchell is not a payor. Payors are the folks who would otherwise, not even in the Workman's Compensation circumstance, because again, there can be no steerage as a matter of rule. But even if there were some type of way that these folks who were making referrals to specialists in the work comp setting knew about Steve Holland, maybe that he'd have an opportunity by luck to be drawn when someone makes that referral. There was no way for him to be able to enjoy that benefit, Your Honors. The whole nature of the HCA case says that steerage, and there was discussion at trial about the distinction between steerage and potential steerage. You're right. There is no guarantee. But there's got to be some system, some mechanism in place where you have the opportunity, perhaps, of seeing more patients. In footnote 43 to the HCA case, which is the 11th Circuit case that is directly on point and written by His Honor Judge Gerald Joflat, steerage means actively encouraging planned participants to seek the services of the providers by means of financial incentives. Okay, we've all agreed there were no financial incentives. How else can you do it? Well, reduced copays, deductible amounts. Don't have that because there's no financial incentive. Also, steerage can occur through communication efforts. There were no communication efforts. There was not a shred of evidence. The only evidence was Steve Holland specifically confirmed, I went on all the websites, I looked at all the directory networks, I wasn't listed anywhere. And on all the information that I was provided or was available to me on the website, none of these payers are listed. There is no communication that would otherwise result, there's no mechanism in place that would otherwise result in patients being sent from these payers to Steve Holland. None. Steerage communication efforts, there could be a hotline to inform potential referrals, who the preferred providers are, and then, of course, there's the issuance of identification cards. None of those things were in place here. With respect to the issue of punitive damages, Judge Elrod, even if this Court were inclined to say there is no civil conspiracy, in the case Georgia Pacific, which was cited specifically in the reply brief, and I liked this particular indication from the Court because of the language that was used. We've suggested, and the evidence of trial demonstrated that this was an intentional breach. Under the PHCS 2006 agreement, the organization agreed to enter into contracts with payors, with folks that they would thus have a contractual opportunity to supervise, to enforce, to garner accountability from, and to otherwise keep them honest with respect to making sure they were referring folks to their preferred providers. Was the intentional breach raised too late in the District Court such that the District Court that the intentional nature of it could strike that as a possible thing to argue? You know, when we adopted the Federal Rules of Civil Procedure, we essentially extinguished that requirement that everything be pled with specificity. The pleadings that were in place... The pendulum has swung towards specificity in the past 10 years in a really strong way. And it has. I would respectfully suggest that because we specifically pled breach of contract, whether the evidence demonstrates that breach of contract was unintentional or whether that breach of contract was intentional and tortuous is really for proof at trial, and to some extent the jury still has the opportunity to make those I don't believe so, Your Honor. I would suggest that when the Court... Isn't that yes or no? I mean, I'm not trying to quibble with you here, but... The Court struck the fraud and misrepresentation claims, but again, and I apologize if I'm not remembering the record correctly. Why didn't your opponent mention an attempt to amend that was disallowed? And what was the reason given for the disallowance of the amendment that apparently contained the words the intentional breach? Again, I apologize, Your Honors. I don't know the answer. It may have been a time issue. It was my recollection the Court indicated there wasn't sufficient evidence to support that amendment. And again, in Georgia Pacific it says it's crystal clear that a breach of contract action certainly carries the potential to recover punitive damages. Well, we'll check the record, but I understood from your opponent that earlier in the case there was an attempt to amend the complaint. Not in terms of what the evidence was at trial, or right even before trial as a motion in limine. There was an attempt to amend that was disallowed, and I understood it... That was procedurally beyond the time frame. ...timely pled. Yes, Your Honor, that was procedurally beyond the time frame. Again, I apologize. I didn't mean to mislead the Court in any way. The nature of the intentional breach of contract is that by entering into agreements with someone other than payors, and by allowing those folks to continue to sell the access to the discount farther downstream, MultiPlan loses more control over these people. Again, there's no supervisory ability. There's no way to enforce the potential steerage. Steerage has to be active. There's got to be some effort, some mechanism in place. In the subject matter contract, Your Honors, it's section 4.5. We will market your services. No, you didn't. And you knew in advance that you weren't going to, because you told these providers that you're going to be able to afford them the protections against these potential rental silent PPOs, but by entering into agreements with non-payors, you lost that accountability and control. I appreciate your patience, Your Honors. Thank you. Thank you. A record site? Yes. It's 3369. Thank you. I think we have your arguments. This case is submitted. Thank you.